# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JAMES CAMPER** | **CIVIL ACTION** |
| **VERSUS** | **NO.   15-318** |
| **N. BURL CAIN, WARDEN** | **SECTION: "F"(5)** |

## <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2).    For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

### *Procedural History*

Petitioner, James Camper, is a convicted inmate incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.    Camper was initially charged with first-degree murder, but that charge was later amended to second-degree murder in violation of Louisiana Revised Statute 14:30.1.[1]    Following a three-day trial, on October 25, 2007, a jury found

---

[1] State Rec., Vol. 1 of 6, Orleans Parish Bill of Indictment.

him guilty of second-degree murder.[2]    On November 15, 2007, he was sentenced to life

imprisonment without benefit of probation, parole or suspension of sentence.[3]

On direct appeal, Camper assigned the following errors: (1) the trial court's failure to

declare a mistrial during instances where the prosecutor made improper comments during

open argument, the trial judge commented on evidence by mischaracterizing a witness's

testimony, the prosecutor used hearsay to bolster the victim's character, the prosecutor

elicited testimony from a detective that referred to Camper's post-arrest silence, and the

prosecutor made two improper remarks during closing argument and (2) the trial court's

failure to advise him of the prescriptive period for seeking post-conviction relief.    On

October 1, 2008, the Louisiana Fourth Circuit Court of Appeal conditionally affirmed the

conviction and sentence, and based on an error patent remanded the matter for a *nunc pro*

*tunc* determination as to Camper's competency to proceed.[4]

After a hearing held February 5, 2009, the trial court determined retrospectively that

---

[2]  State Rec., Vol. 2 of 6, Minute Entry, 10/25/07.

[3]  State Rec., Vol. 1 of 6, Sentence of the Court (Nov. 15, 2007); *see also* State Rec., Vol. 2 of 6, Minute Entry, 11/15/07.

[4]  *State v. Camper*, 2008-KA-0314 (La. App. 4th Cir. 10/1/08), 996 So.2d 571. *See* State Rec., Vol. 3 of 6.   The docket master indicated that the defense had moved for a lunacy commission and that a hearing was set, but the record did not reflect any ruling on his capacity to proceed.   A minute entry showed that Camper had been interviewed by Dr. Deland.   Thus, the appellate court deemed it best to remand for a *nunc pro tunc* hearing to determine competency retrospectively under *State v. Snyder*, 98-1078, p. 30 (La. 4/14/99), 750 So.2d 832, 854.

Camper was indeed competent to proceed with trial.[5]   Camper, who was represented by trial counsel but not present for the hearing, sought no further direct appeals from his conviction and sentence.

On June 30, 2009, Camper submitted an application for post-conviction relief to the Orleans Parish *Civil* District Court.[6]   The clerk's office of the Orleans Parish Civil District Court apparently attempted to forward the application to the criminal district court as reflected in correspondence dated July 6, 2009.[7]   The post-conviction application was placed in the criminal record, although the docket master does not reflect the trial court's date of receipt.[8]   No file stamp date appears on the application.   Nor is there any

---

[5]  State Rec, Vol. 2 of 6, Minute Entry, 2/5/09.

[6]  Federal *habeas* courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system."   *Causey v. Cain*, 450 F.3d 601, 607 (5th Cir. 2006). If that date cannot be gleaned from the state court record with respect to the filing, this Court will use the signature date of the applications as the filing date, in that the various applications were obviously placed in the mail no earlier than the date they were signed. In those instances where no signature date appears on a document and no other evidence is available, the Court will look to the file-stamp placed on the document by the clerk of court.

[7]  State Rec., Vol. 2 of 6, Uniform Application for Post-Conviction Relief signed June 30, 2009 (envelope addressed to Civil District Court postmarked June 30, 2009).   In that application, Camper asserted claims of prosecutorial misconduct and police corruption. The State points out that Camper's PCR application references an earlier civil case (CDC No. 2007-5194 Division 1-14) initiated by Camper in the civil district court.   Rec. Doc. 16, State's Response, p. 3 n. 5.   See also State Rec., Vol. 2 of 6, Correspondence dated July 6, 2009 from Civil District Clerk of Court to Orleans Parish Criminal District Court.

[8]  State Rec., Vol. 2 of 6, Docket Master.

indication in the state-court record that the trial court acknowledged or ruled on the 2009 application.

On April 27, 2011, more than two years following the conditional affirmance and *nunc pro tunc* competency ruling, Camper filed with the court of appeal a "Motion to Enforce Judgment/Mandamus" seeking to enforce the Louisiana Fourth Circuit's October 2008 judgment.[9]   On June 2, 2011, the Louisiana Fourth Circuit denied the writ of mandamus because the record reflected the trial court's compliance with the remand instruction.[10]   On June 29, 2011, he filed a motion for extension of time to submit a supervisory writ application with the Louisiana Supreme Court.   There is no indication in the record that any extension was given and the state-court record contains no writ application.[11]   On March 30, 2012, the Louisiana Supreme Court denied relief without stated reasons.[12]

On May 10, 2011, Camper filed a "Motion to Disregard Motion to Withdraw Application for Post-Conviction Relief and to Stay and Abate Pending Application for Post-

---

[9]   State Rec., Vol. 1 of 6.   A copy of the motion to enforce filed with the court of appeal was also forwarded to the criminal district court and stamped as filed May 12, 2011. *See also* Docket Master, 5/12/11.

[10]   State Rec., Vol. 6 of 6, *State v. Camper*, 2011-K-0584 (La. App. 4th Cir. June 2, 2011).

[11]   *Id.*, Motion for Extension of Time.   The Court notes that Camper himself signed the Order attached to his motion in the signature block designated for a judicial officer.

[12]   *Id.*, *State ex rel. Camper v. State*, 2011-OK-1461 (La. 3/30/12), 85 So.3d 112.

Conviction Relief" with the state criminal district court.[13]   On August 1, 2011, Camper

submitted a "Notice of Intent to Amend or Supplement," as well as a "Motion to Supplement

Previously Filed Application for Post-Conviction Relief," a "Motion for an Evidentiary

Hearing," and an "Application for Supplemental Post-Conviction Relief with Memorandum of

Law in Support and Request for Evidentiary Hearing."[14]   In his supplemental application

for relief, he raised the following claims:   (1) trial counsel rendered ineffective assistance

in failing to obtain witnesses and present a defense; request a special jury instruction on the

mandatory sentencing issue; object when the trial judge commented on the evidence at trial;

and file a second notice of appeal following the *nunc pro* tunc competency determination; (2)

denial of his right to appellate review and to free copies of the record in order to properly

present and argue several claims on post-conviction review; and (3) cumulative error denied

him a fair trial.

---

[13]   State Rec., Vol. 1 of 6, Motion to Disregard Motion to Withdraw Application for Post-Conviction Relief with certificate of service dated May 10, 2011 (postmarked June 21, 2011 and stamped as filed June 24, 2011); *see also* Docket Master Entry, 6/24/11.   The docket master also includes an entry dated July 11, 2011 for receipt of a Motion to Withdraw Application for Post-Conviction Relief or in Alternative Stay and Abate, although the motion itself is not included in the state court record.   The Court notes that the proposed Order attached to Camper's motion to disregard was actually signed by Camper himself, not the criminal district judge.

[14]   *Id.*, Notice of Intent, Motion to Supplement, Motion for Evidentiary Hearing, and Application for Supplemental Post-Conviction Relief. His motion to supplement references a post-conviction relief application allegedly filed on January 12, 2011, which is not contained in the state court record.   Most of these pleadings were stamped as filed on August 10, 2011.

On May 1, 2012, he filed a Petition for Writ of Mandamus with the Louisiana Fourth Circuit requesting an order issue to the state district court to rule on his application for post-conviction relief.    On June 1, 2012, that petition was granted for the sole purpose of transferring the matter to the district court for a ruling on the application for post-conviction relief.[15]    On July 27, 2012, the state district court denied Camper's post-conviction relief application.[16]

On October 17, 2012, Camper filed a Motion to Enforce Mandate, asserting that the state district court had not yet ruled on his post-conviction relief application and requesting that the Louisiana Fourth Circuit issue an order to the state district court to enforce its June 1, 2012 ruling.    Noting that the state district court had already complied by denying post-conviction relief, the Louisiana Fourth Circuit denied the motion to enforce on November 6, 2012.[17]

On January 2, 2013, Camper filed with the state district court a notice of intent to seek supervisory writs to the court of appeal from the state district-court ruling denying his application for post-conviction relief, as to which he claimed he had only recently received

---

[15]  State Rec., Vol. 6 of 6, *State v. Camper*, 2012-K-0667 (La. App. 4th Cir. June 1, 2012).

[16]  State Rec., Vol. 2 of 6, Docket Master and Minute Entry, 7/27/12.

[17]  State Rec., Vol. 6 of 6, *State v. Camper*, 2012-K-1533 (La. App. 4th Cir. Nov. 6, 2012).

notice of the denial.[18]    On April 1, 2013, he filed a Petition for Writ of Mandamus with the Louisiana Fourth Circuit, seeking a ruling on the notice of intent filed in the state district court.    On May 16, 2013, the court of appeal granted the writ, transferred the notice of intent to the district court for consideration and ordered the district court to provide Camper with a copy of the July 27, 2012 ruling denying his application for post-conviction relief.[19] The state district court record reflects a minute entry on July 3, 2013, acknowledging the above writ ruling, and stating "the record shows the defendant [sic] post-conviction relief was denied on 7/27/12. There is no evidence in record to reverse court's ruling regarding this denial. Notice is denied."[20]

On August 26, 2013, Camper filed a supervisory writ application with the Louisiana Fourth Circuit Court of Appeal in which he challenged the state district court's ruling denying his application for post-conviction relief.    On September 18, 2013, the court of appeal denied relief, finding no error in the judgment denying relator's supplemental application for post-conviction relief.[21]    On October 9, 2013, Camper filed a related writ application with the Louisiana Supreme Court.    That application was denied without stated reasons on

---

[18]  State Rec., Vol. 1 of 6, Notice of Intent signed January 2, 2013.

[19]  State Rec., Vol. 6 of 6, Petition for Writ of Mandamus, No. 13-K-0545; *State v. Camper*, 13-K-0545 (La. App. 4th Cir. May 16, 2013).

[20]  State Rec., Vol. 2 of 6, Docket Master and Minute Entry, 7/3/13.

[21]  State Rec, Vol. 6 of 6, *State v. Camper*, 2013-K-1227 (La. App. 4th Cir. Sept. 18, 2013).

May 30, 2014.[22]

On January 30, 2015, Camper filed his federal application for *habeas corpus* relief.[23] In his petition, Camper claims: (1) that his attorney was ineffective for failing to file a notice of appeal from the *nunc pro tunc* competency determination thereby denying him the right to appellate review; failing to assert a competent defense at trial and call a critical witness on his behalf; and failing to object when the trial court commented on evidence before the jury; (2) he was denied the right to appellate review on post-conviction relief because he was denied free copies of the record; and (3) cumulative error denied him a fair trial.    The State filed a response challenging the application as untimely and a supplemental response addressing the merits.    Rec. Doc. 24.    Camper filed a reply to the State's response.    Rec. Doc. 25.

*Facts*

The following facts were established at trial and summarized by the Louisiana Fourth Circuit Court of Appeal:

> Shortly after midnight on New Year's Eve and in the early morning hours of January 1, 2005, Daniel Washington was murdered in front of his house at 1509 Marais Street in New Orleans. His next door neighbor (Camper) was initially indicted for first-degree murder but the indictment was subsequently amended and the defendant was charged with second-degree murder. The defendant pleaded not guilty and his subsequent motions to suppress the evidence and identification were denied on July 25, 2007.

---

[22]  *State v. Camper*, 2013-KH-2477 (La. 5/30/14), 144 So.3d 1035; State Rec., Vol. 6 of 6.

[23]  Rec. Doc. 3, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus delivered to prison officials for mailing on January 30, 2015.

8

In a three-day jury trial in October 2007, the following evidence was adduced. Mrs. Casey J. Washington testified that she and the victim had been married about fifteen months and for approximately a year had lived with two young sons at 1509 Marais Street, next door to the defendant and his wife who lived at 1511 Marais Street. Her husband, an employee of the Red Fish Grill Restaurant in New Orleans, returned home from working the 4:00 p.m. to midnight shift shortly before his death. According to Mrs. Washington, she heard him arrive home a little past midnight, lock his bicycle to the fence, and wish people in the vicinity "Happy New Year." When he did not enter the house within a reasonable amount of time, however, she went to the front door to check on him. Upon opening the door, Mrs. Washington saw her husband lying on the steps with head and chest wounds and the defendant standing approximately a foot from his head. She briefly tried to revive her husband but when she saw the defendant with a gun, she ran. As she ran, she hear [sic] three or four gunshots which she assumed were fired at her. She saw the defendant get in his truck and leave. Shortly thereafter, Mrs. Washington identified the defendant as the shooter from a photo identification compiled by Detective Jimmi Turner of the New Orleans Police Department (NOPD). According to Mrs. Washington, her husband was unarmed on the night of his murder.

A resident of 1507 Marais, Fletcher Johnson, also testified. Johnson stated that on the night of the murder, he was fifteen years old and standing on the front porch of his residence when the victim returned home on his bicycle shortly after midnight. As Johnson watched, the victim parked his bike and then "got into it" with the defendant, berating the defendant for throwing a firecracker near his front door because his children could have been in the vicinity. Johnson testified that he saw the defendant cock his gun and shoot the victim in the chest and then, as the victim fell to his knees on his front steps, walk up to the victim and shoot him a second time, this time in the head. Johnson stated that he did not hear the victim say anything after being shot, denied seeing any aggressive behavior by the victim toward the defendant, and asserted that the victim was not armed. Johnson testified that he retreated into his house after the second shot was fired and that he spoke to the police on the night of the murder, as well as on other occasions, identifying the defendant as the shooter. In addition, Johnson identified the defendant in court as the man who shot the victim.

Ms. Pearl Thomas, Washington's older sister, confirmed that her brother and his family lived at the Marais Street address for approximately one year prior

to the shooting. According to Ms. Thomas, her last conversation with the victim occurred very early New Year's Day when he wished her happiness for the New Year. Later on New Year's Day, she was informed of his death by the victim's wife.

Lieutenant Dwayne Scheurmann testified at trial that he responded to the shooting at 1509 Marais Street in the early morning hours of January 1, 2005. He found the victim bleeding heavily from gunshot wounds, called for emergency assistance before directing other officers in securing the scene, photographing the scene, collecting evidence and contacting witnesses. After securing the scene, Lieutenant Scheurmann entered the defendant's residence to check for other possible victims and to preserve potential evidence. He observed state motor vehicle documentation on a truck registered in the defendant's name and, because he had been informed the defendant fled the area in his truck, took the documentation to broadcast the information to the authorities in case they came in contact with the defendant. Neighbors at the scene identified the defendant as the shooter. Police did not receive any information from witnesses at the scene that the victim was armed at the time of the shooting, nor did they recover the murder weapon.

Officer Meredith Acosta, a NOPD firearms examiner at the time of the shooting, analyzed the three 9–millimeter cartridge cases recovered at the scene and the bullet and bullet fragments recovered during the autopsy performed on the victim's body. Her testing proved that the cartridge casings were fired by the same weapon. However, the bullet fragments obtained from the autopsy were unsuitable for caliber identification and firearms comparison purposes. Officer Acosta was not able to link the casings or fragments to a particular weapon because none was provided to her.

The parties stipulated that Terese Smith, if called as a witness, would testify in her capacity as a crime scene technician that she photographed the scene, collected ballistic evidence and retrieved the victim's belongings at the direction of Detective Jimmi Turner.

Detective Turner testified that when he arrived on the scene of the shooting, he spoke with other officers who began the investigation, as well as to the victim's wife and Fletcher Johnson at the murder scene and, subsequently, at headquarters in formal interviews. Detective Turner also interviewed the defendant's stepson, Alonzo Birch, Alonzo's girlfriend, Ms. Joyce Birch, and the defendant's wife, Mrs. Evelyn Camper. From those recorded interviews,

Turner obtained a photograph of the defendant for confirmation identification purposes. After receiving the photo, Detective Turner requested a warrant for the defendant's arrest. The defendant was arrested approximately a year later.

Dr. Sarah Deland, a board certified forensic psychiatrist, testified on behalf of the defense. Dr. Deland testified that, according to her review of the coroner's report, the victim was legally intoxicated and under the influence of sedative medications at the time of his death. She stated that while the alcohol and controlled substances ingested by the victim generally act as sedatives, in combination those substances can act as disinhibitors, i.e., causing behavioral disturbance, inability to make rational judgments, and/or prompting a person to do things he or she would not ordinarily do.

Pat Kent, a psychotherapist specializing in substance abuse, also testified for the defense, stating that a person under the effects of alcohol and anxiolytic drugs, such as Valium, Xanax and benedryl, could become agitated.[24]

The defendant, a fifty-five year old grandfather, testified on his own behalf. He had two prior felony convictions, a 1990 aggravated battery conviction and a 1994 simple battery conviction. A pipe-fitter by profession, the defendant had been married approximately twenty years and had lived with his family without incident on Marais Street for approximately four years prior to the shooting. Although he got along well with his other neighbors, he and the Washington's had conflicts over the fence he and the landlord put up in the common backyard of 1509–11 Marais Street. In addition, the defendant testified that he observed Washington selling drugs in the neighborhood to both teenagers and adults from his stash of drugs near the fuse box of the Marais Street house. The defendant also observed Johnson selling drugs with Washington but when he confronted Johnson about his actions, Johnson boasted that he could get any criminal charge thrown out. According to the defendant, he had called the police fourteen times to report Washington's drug dealing but the police never arrested him.[25]   In one specific incident, a conflict arose between the two men when the defendant changed a fuse in his fuse box which was located on the Washingtons' side of the duplex next to the

---

[24]   Mr. Kent reviewed the victim's autopsy results which indicated the presence of Valium, Xanax, benedryl and alcohol in his system the night he was killed.

[25]   No evidence appears in the record either to support or dispute this claim.

Washington's fuse box. After Mrs. Washington apparently reported to her husband that he had changed a fuse, Washington confronted the defendant, yelling obscenities, brandishing a gun, and threatening to shoot him. Although the defendant called the police, they took no action and later that night the defendant's truck was riddled with bullet holes.

The defendant testified that he shot Washington because he feared for his and his family's safety based upon the Washington's past behavior toward him and drug dealing. According to the defendant, Washington arrived home talking loudly and acting crazy on the night of the shooting. When the defendant's granddaughter lit a firecracker, Washington accused the child of throwing it at him and began arguing with the defendant's son, Alonzo. When Washington began to wave his gun in the air, the defendant's wife went into their house and retrieved a gun which she had purchased unbeknownst to the defendant. His wife handed him the gun to enable him to protect the family and, at that point, Washington raised his gun as if to shoot the defendant or a family member. The defendant shot him and then, because Washington attempted to raise his gun after the first shot, he shot him a second time. According to the defendant, neither Johnson nor Mrs. Washington were eyewitnesses to the shooting because neither was outside at the time. Because he was afraid of retribution from Washington's drug dealing friends in the neighborhood and because, despite his complaints, he had received no police protection or help in the past, the defendant fled the area.[26]

*Analysis*

Initially, the Court must determine whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and the claims must not be in "procedural default." *Nobles v. Johnson*, 127 F.3d 409, 419–20 (5th Cir.1997) (citing 28 U.S.C. § 2254(b),(c)).   The State concedes that Camper has exhausted his state-court remedies

---

[26] *State v. Camper*, 996 So.2d at 574-77 (footnotes in original).

with respect to all of the claims and does not argue that the claims have been procedurally defaulted;[27]  however, the State submits that the petition is untimely.   For the following reasons, the Court rejects the State's argument that the federal application is untimely and will therefore review the merits of the claims.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq.*, governs the filing date for this action because Camper filed his *habeas* petition after the AEDPA's effective date.    *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).    Title 28 U.S.C. § 2244(d) provides, in pertinent part:

(1)     A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

A.     the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

B.     the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

C.     the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

D.     the date on which the factual predicate of the claim or claims

---

[27]  In a supplemental response, the State notes that while theoretically "possible or conceivable" that the trial court viewed the claims as procedurally barred, the better conclusion is that the claims were in fact considered and denied on the merits.    Rec. Doc. 24, p. 6.

> presented could have been discovered through the exercise of due diligence.

    (2)     The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

The AEDPA generally requires that a petitioner bring his Section 2254 claims within one year of the date on which his underlying criminal judgment becomes "final."   With regard to finality, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. *Roberts v. Cockrell*, 319 F.3d 690, 693 (5th Cir.2003). However, "[i]f the defendant stops the appeal process before that point," ... "the conviction becomes final when the time for seeking further direct review in the state court expires." *Id.* at 694; *see also Foreman v. Dretke*, 383 F.3d 336, 338 (5th Cir.2004) (Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).

> Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review. *See Foreman*, 383 F.3d at 338–39. As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal. *See Causey v. Cain*, 450 F.3d 601, 606 (5th Cir.2006); *Roberts*, 319 F.3d at 693.

*Butler v. Cain*, 533 F.3d 314, 317 (5th Cir.2008).

The limitations period is subject to statutory tolling for the time during which "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2).    In order for a state application to be considered "properly filed" for purposes of § 2244(d)(2), the delivery and acceptance of the application must be in compliance with the applicable state laws and rules governing filings.    *Pace v. DiGuglielmo*, 544 U.S. 408, 413-14, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005), *citing Artuz v. Bennett*, 531 U.S. 4, 8, 121 S.Ct. 361, 364 (2000).    A state application is "pending" both while it is before a state court for review and also during the interval after a state court's disposition, while the petitioner is authorized to proceed to review at the next level of state consideration.    *Melancon v. Kaylo*, 259 F.3d 401, 406 (5th Cir. 2001); *see also Carey v. Saffold*, 536 U.S. 214, 219-220, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002) (an application is "pending" as long as the ordinary state collateral review process is in continuance).

In this case, the court of appeal rendered a decision on October 1, 2008, conditionally affirming the conviction and sentence, subject to the trial court's *nunc pro tunc* determination of competency.    The trial court held a hearing and entered its ruling on February 5, 2009.    Camper's conviction therefore became final, for federal limitations purposes, at the latest on March 9, 2009,[28]   thirty (30) days after the district court's *nunc pro*

_____

[28]   March 7, 2009 was a Saturday. Louisiana Code of Criminal Procedure article 914 provides that a defendant has thirty days, not including legal holidays and half-holidays, to notice his intent to appeal a conviction or sentence.    In Louisiana, all Sundays are legal

*tunc* hearing and ruling on competency, when his time limit expired for filing any further appeals from his conviction and sentence.    Although Camper suggests that his conviction only became final when he received notice, his position that finality runs from receipt of notice of judgment is contrary to federal law.    *See Roberts*, 319 F.3d at 694–95; *Crutcher v. Cockrell*, 301 F.3d 656, 657 (5th Cir. 2002).    Under a plain reading of the statute, the AEDPA one-year limitations period began to run on March 10, 2009, the day after his conviction was final, and continued to run uninterrupted for one year, until March 10, 2010, when it expired.

The State submits that Camper had no properly filed state application for post-conviction or other collateral review, as defined above, pending during the relevant one-year period in order to toll the statute of limitations.    The Court finds, however, that the State incorrectly concludes that Camper is not entitled to any statutory tolling for his application for post-conviction relief signed and dated June 30, 2009.

In order to trigger statutory tolling, the application must be "properly filed" within the meaning of Section 2244(d)(2), that is, the applicant must have complied with all of the State's procedural requirements, such as timeliness and place of filing.    *Pace v. DiGuglielmo*, 544 U.S. 408, 413–14 (2005); *Williams v. Cain*, 217 F.3d 303, 306–08 & n. 4 (5th Cir. 2000) (quoting *Smith v. Ward*, 209 F.3d 383, 384–85 (5th Cir. 2000)); *Villegas v. Johnson*, 184 F.3d 467, 468–69 (5th Cir.1999), *reh'g denied*, 196 F.3d 1259 (5th Cir. 1999).    As the Fifth

---

holidays and all Saturdays are, depending on the locality, either holidays or half-holidays. La. Rev. Stat. § 1:55(A).

Circuit has explained, "[B]y procedural filing requirements, we mean those prerequisites that must be satisfied before a state court will allow a petition to be filed and accorded some level of judicial review."   *Villegas*, 184 F.3d at 470 n 2.   The Supreme Court has discussed the plain meaning of the term "filed":

> An application is "filed," as that term is commonly understood, when it is delivered to, and accepted by, the appropriate court officer for placement into the official record. *See, e.g., United States v. Lombardo*, 241 U.S. 73, 76, 36 S.Ct. 508, 60 L.Ed. 897 (1916) ("A paper is filed when it is delivered to the proper official and by him received and filed"); Black's Law Dictionary 642 (7th ed.1999) (defining "file" as "[t]o deliver a legal document to the court clerk or record custodian for placement into the official record"). And an application is "properly filed" when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee.

*Artuz*, 531 U.S. at 8.   Lack of jurisdiction has been deemed a "condition to filing" which precludes the application of statutory tolling.   *See Pace v. DiGuglielmo*, 544 U.S. 408, 414 n. 4, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005) (comparing the untimely filing of a state habeas corpus petition with the absence of jurisdiction over a petition) (citing *Artuz*, 531 U.S. at 9).

The state court record shows that on June 30, 2009, Camper mailed a post-conviction application to the Orleans Parish Civil District Court.   Upon receipt, the civil district court noted that the documents were intended for the criminal district court and promptly forwarded Camper's application to the proper court by letter dated July 6, 2009.   The Orleans Parish Criminal District Clerk of Court received the documents and placed them into the state-court record.

The State argues that the application was not properly filed because "Camper sent his application not to 'the court and office in which it must be lodged' (namely, the clerk's office for the criminal district court), but instead to the Orleans Parish Civil District Court."[29]   The State also argues that the petition does not comply with procedural law, Louisiana Code of Civil Procedure article 926 (C), because although it contains a signed affirmation (entitled Affidavit) that the allegations contained in the petition are true and correct, it lacks a notary inscription or other indicia of an "attestation under oath."[30]

There is support for the position that an application filed in the wrong court does not comply with state procedural requirements and could not serve to toll the one-year limitations period.   *Artuz*, 531 U.S. at 9 (If "an application is erroneously accepted by the clerk of a court lacking jurisdiction ... it will be pending, but not properly filed."); *Larry v. Dretke*, 361 F.3d 890 (5th Cir. 2004) (state application was not "properly filed" for tolling purposes because under Texas procedural law the TCCA did not have jurisdiction to consider the application until the judgment was final).   However, the circumstances in this case differ from those scenarios.   Although Camper sent the petition initially to the wrong court, it was not filed there, but instead forwarded to the appropriate court.   The State fails to address the implications of an application that was simply forwarded by the wrong court to

---

[29]   Rec. Doc. 16, p. 8.

[30]   La. Code Crim. Proc. art. 926(C) states the application shall be signed by the petitioner and accompanied by his affidavit that the allegations contained in the petition are true to the best of his information and belief.

the correct court and then accepted by the proper court for filing into the record.     In fact, the State has cited no federal authority to show that under these circumstances the application is not deemed properly filed for purposes of statutory tolling under the AEDPA. Moreover, no ruling was ever issued by the criminal district court or any other court rejecting that application based on jurisdiction or any procedural deficiency.   *See Buras v. Cain*, 14-2963, 2016 WL 6477039, at *3 (E.D. La. May 5, 2016) (affording tolling credit even where state district court rejected post-conviction application for lack of notarization because petitioner was constrained by notarial services in prison and quickly corrected the defect once informed by the state district court).     Accordingly, the Court finds that this was a properly filed state-court application that statutorily tolled the one-year limitations period.

The State additionally argues that even if the petition is deemed properly filed and thus given tolling effect, tolling ceased when the trial court denied post-conviction relief on July 27, 2012.     Under the particular circumstances of this case, however, that argument is misplaced.     Camper filed another application for post-conviction relief, styled as a supplemental application, raising additional, independent claims for relief that differ entirely from those grounds raised in his June 30, 2009 application.     The court of appeal granted Camper mandamus relief as requested and ordered the district court to consider that supplemental application, which the district court expressly did by its ruling of July 27, 2012. That ruling arguably did not encompass the June 30, 2009 post-conviction claims raised by

Camper.[31]     Indeed there is no evidence that the district court has ever ruled on Camper's June 30, 2009 application, which remained (and still theoretically remains) pending and suffices to toll the one-year limitations period.[32]     For this reason, the Court considers the instant federal application timely.

### Standards of Review on the Merits

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure questions of fact, pure questions of law, and mixed questions of both.     A state court's purely factual determinations are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing

---

[31]   The Court cannot discern from the minute entry the precise claims addressed; however, the minute entry includes reference to the Louisiana Fourth Circuit's order that plainly relates to Camper's supplemental PCR application and claims raised therein.

[32]   It does not appear that Camper would have had any knowledge that his June 30, 2009 post-conviction application was transmitted to the Orleans Parish Criminal District Court.     There is no evidence that the letter from the civil district clerk of court was also sent to Camper.     Nor is there any evidence in the record that the criminal district court notified Camper that it had been received and placed into the criminal case record.

evidence."). With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010). An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. A state court's merely incorrect application of Supreme Court precedent simply does not warrant *habeas* relief. *Puckett v. Epps*, 641 F.3d 657, 663 (5th

Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").    "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA.    *Harrington v. Richter*, 562 U.S. 86, 102 (2011).    Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents."    *Harrington*, 562 U.S. at 102 (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1866 (2010) ("AEDPA prevents defendants—and federal courts—from using federal *habeas corpus* review as a vehicle to second-guess the reasonable decisions of state courts.").

## A.  Ineffective Assistance of Counsel

Camper asserts that trial counsel was constitutionally ineffective for failing to file a notice of appeal, failing to call his wife as a defense witness, and failing to object when the trial judge made an erroneous comment about the evidence.    The state district court denied these claims raised in his supplemental application for post-conviction relief without discussion.    The appellate courts likewise summarily denied relief.

### 1.  Controlling Legal Principles – Strickland/Flores-Ortega

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel.    Specifically, a petitioner seeking relief must demonstrate both that counsel's performance was deficient and that the deficient

performance prejudiced his defense.    *Strickland v. Washington*, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."    *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, *i.e*, deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.    *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.    *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998).    Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689.    "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"    *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690).    A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.    *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.    In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

In the context of an alleged failure to file a notice of appeal, controlling Supreme Court precedent requires a specific analysis with respect to performance deficiency, as explained by the United States Fifth Circuit Court of Appeals:

> Under *Roe v. Flores–Ortega*, 528 U.S. 470, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000), "a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." In cases where the defendant "neither instructs counsel to file an appeal nor asks that an appeal not be taken," the deficient-performance inquiry involves "a separate, but antecedent, question: whether counsel in fact consulted with the defendant about an appeal." In this context, "consult" means that counsel tendered advice about the advantages and disadvantages of appealing and made a "reasonable effort to discover" the defendant's wishes on the issue. In those cases where counsel has consulted with the defendant, deficient performance is shown if counsel fails "to follow the defendant's express instructions with respect to an appeal."
>
> If counsel has not consulted with the defendant about appealing, the deficient-performance inquiry focuses on whether the decision not to consult with the defendant was unreasonable. Counsel has a constitutionally imposed duty to consult with a defendant about appealing "when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." The general requirement is that the attorney's decision whether to consult with the defendant be an objectively reasonable choice in light of all relevant factors.

*United States v. Calderon*, 14-51204, 2016 WL 7187375, at *6 (5th Cir. 2016).   The Supreme

Court in *Ortega-Flores* observed that in making the determination as to whether a duty to

consult exists, courts must take into account all the information counsel knew or should have

known."   *Flores-Ortega*, 528 U.S. at 479-80 (citations omitted).   The Court observed

certain relevant factors include, for instance, whether the conviction follows a guilty plea,

whether the defendant received the sentence bargained for as part of a plea agreement,

whether the plea agreement waived appellate rights, and whether there are nonfrivolous

grounds for appeal.   *Id.*

   The prejudice prong of *Strickland* in this context requires proof that counsel's

constitutionally deficient performance deprived defendant of an appeal that he otherwise

would have taken, regardless of whether his appeal has merit.   *Id.* at 484-486.   That is,

"to show prejudice in these circumstances, a defendant must demonstrate that there is a

reasonable probability that, but for counsel's deficient failure to consult with him about an

appeal, he would have timely appealed."   *Id.* at 484.   "[E]vidence that there were

nonfrivolous grounds for appeal or that the defendant in question promptly expressed a

desire to appeal will often be highly relevant in making this determination."   *Id.* at 485.

   The United States Supreme Court declined to adopt a bright-line rule that counsel

must always consult with the defendant regarding an appeal.   *Id.*   In doing so, the

Supreme Court reasoned:   "[W]e have held that the Federal Constitution imposes one

general requirement:   that counsel make objectively reasonable choices.   We cannot say,

as a constitutional matter, that in every case counsel's failure to consult with the defendant about an appeal is necessarily unreasonable, and therefore deficient.   Such a holding would be inconsistent with both our decision in *Strickland* and common sense."   *Id.* at 479 (citations omitted).

Because the state courts rejected the ineffective-assistance-of-counsel claims on the merits and because such claims present a mixed question of law and fact, this Court must defer to the state-court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."   28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). In fact, the United States Supreme Court has held that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims must be "doubly deferential" in order to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. at 190).

   *2.   Ineffective assistance of counsel for failure to file an appeal*

Camper asserts that defense counsel performed deficiently in failing to file a motion for appeal from the *nunc pro tunc* competency determination on remand following the appellate court's conditional affirmance of his conviction and sentence.[33]   Specifically,

---

[33]   The Louisiana Fourth Circuit Court of Appeal conditionally affirmed Camper's conviction and sentence without a reservation of his right to appeal from any subsequent adverse ruling.   *See and compare, State v. Gaspard*, 2014-0903 (La. App. 1st Cir. 1/15/15), 169 So.3d 407; *State v. Gaspard*, 2011-2098, 2012 WL 6737838, at *6 (La. App. 1st Cir. 12/28/12) (appeal after *nunc pro tunc* competency ruling where court of appeal had noted

Camper alleges that he was neither informed of the remand hearing that took place nor provided notice of a decision, and defense counsel never consulted him with regard to an appeal.    These allegations are troubling, for counsel certainly has an obligation to keep his client informed of the progress of his case.    *See Strickland*, 466 U.S. at 688.    However, absent evidentiary support in the record for these allegations, it simply has not been shown what transpired between counsel and his client after the ruling on remand.    The record does strongly suggest that no personal meeting occurred between defense counsel and his client because Camper presumably was unaware of the competency ruling when he filed for mandamus relief in 2011.    Whether counsel ever attempted to notify him of the ruling (perhaps by correspondence) is unknown, though even that communication would not constitute "consultation" regarding an appeal as defined by the Supreme Court.    Moreover, the record conclusively establishes that defense counsel did not consult with Camper at the actual hearing on remand because Camper was not there.    A minute entry for that date confirms that Camper was not present for the hearing and that defense counsel waived his presence.    Under the circumstances, there simply is no indication in the record that defense counsel consulted with Camper regarding any further appeals.    Even if defense counsel failed to consult with Camper about an appeal, however, the Court must also resolve whether counsel was unreasonable in not doing so.

---

reservation of rights).    Though it is less than clear if Camper had the right under state law to a second appeal without that reservation of rights, the Court assumes without deciding, for purposes of discussion, that he did.

Camper cites *Flores-Ortega* for the proposition that failure to file a requested notice of appeal constitutes negligence *per se*; however, he does not assert and the record does not show that counsel in this case disregarded specific instructions to file an appeal.    In the absence of specific instructions, as here, the proper inquiry is actually whether counsel had a *duty to consult* with Camper about a direct appeal from the ruling on remand.    That obligation exists only when counsel has reason to think that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or the defendant reasonably demonstrated that he was interested in appealing.    On the record presented, the Court finds that Camper failed to establish that counsel had a duty to consult.

Counsel had no reason to believe that Camper had any interest in appealing from the retrospective competency determination.    The fact that Camper failed even to inquire with the court or counsel about the progress of proceedings on remand for over two years shows a lack of interest in further pursuit of the matter, including an appeal.    His disinterest on remand corresponds (not surprisingly) with the record evidence that he never seriously disputed his competency to proceed.    The record shows that Camper denied any history of mental-health problems when questioned by Dr. Deland, failed to pursue a competency ruling pretrial, and did not challenge the competency proceedings or lack thereof on direct appeal, where it was considered instead as an error patent.    This pattern continued for collateral-review proceedings where he has not raised the competency issue, but only a failure to file a motion for appeal.

28

Moreover, the record demonstrates that a rational defendant in his position would not have pursued an appeal.    Camper had already pursued a direct appeal challenging his conviction and sentence, where he had an adequate opportunity, through appointed counsel, to present his appeal claims and receive an adjudication on the merits.    The court of appeal conditionally affirmed Camper's conviction and sentence.    The record discloses no nonfrivolous grounds existed for a second direct appeal.    Just as the Supreme Court has observed that a guilty plea greatly reduces the scope of potentially appealable issues and impacts a rational defendant's desire to appeal, *Flores-Ortega*, 528 U.S. at 480, a conditional affirmance of a conviction and sentence with limited remand order on an initial direct appeal narrowly restricts the scope of any subsequent appeal.

Camper's second appeal would be limited solely to the issue of competency. However, the limited hearing on remand included no new evidence to support a challenge to his competency.    Defense counsel offered no evidence at the hearing other than Dr. Deland's original evaluation of Camper, which sufficed to prove competency.    That existing evidence already had been considered on direct appeal and indeed influenced the appellate court's opinion that a retrospective competency determination by the trial court was proper. Because Camper has not advanced the competency issue in this Court or the state courts, he has not shown that any grounds existed to challenge the ruling.    Thus, additionally, Camper cannot show that nonfrivolous grounds existed for a second direct appeal from the retrospective competency ruling.    On this record, the state court reasonably could have

determined there was no reason for defense counsel to think that his client was interested in pursuing another appeal or that a rational defendant in Camper's position would have wanted to appeal.

Moreover, even if Camper could show that counsel had a constitutionally imposed duty to consult him about an appeal from the remand ruling and failed to do so, he has not demonstrated a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed.   Camper does not claim, much less prove, that he would have filed an appeal from the competency ruling on remand but for counsel's failure to consult with him regarding an appeal.   Camper himself has never alleged in his state or federal court applications that he wanted to appeal the ruling on remand as to his competency.   Nor has he raised the competency issue on collateral review. He argues only that counsel should have consulted him about an appeal.   *See United States v. Cruz*, No. 2:12-CR-745, 2015 WL 4459897, at *4 (S.D. Tex. 2015) (finding no prejudice shown where the defendant "does not even claim that he would have filed an appeal if counsel had properly consulted with him") (citing *United States v. Bejarano*, 751 F.3d 280, 286 (5th Cir. 2014).   Under these circumstances, Camper has not established prejudice. "Failure to satisfy either prong of an ineffective assistance claim defeats the claim."   *Id.* at 286.

This Court reviews the actions of the state court based on the record of evidence

before the state court.[34]   *Cullen v. Pinholster*, 563 U.S. 170, 181-83 (2011).   To grant a federal *habeas corpus* petition, the Court must find that the state court decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."   *Harrington v. Richter*, 562 U.S. at 103. Camper has not met this burden.   The Court concludes that the state court reasonably applied Supreme Court law on the evidence presented.   Accordingly, Camper is not entitled to federal *habeas* relief on this claim.

  *3.   Failure to call defense witness*

  Camper next claims that counsel was constitutionally ineffective for failing to call his wife as a witness for the defense.   Specifically, he asserts:

> He told his attorney essentially that he wanted to call his wife, Mrs. Camper to the stand to testify to the truth of what happen [sic] on that night.   She would have testified to the fact that petitioner was in fear of his life and his family's, and that in fact, she gave him the gun because she had the same fear.   She also knew that no help was forthcoming from the police.[35]

Camper offered as evidence in support a signed, unsworn statement by Mrs. Evelyn Camper

---

[34]   Even though Camper may very well be limited in his evidentiary support for his claim due to the lack of a state-court post-conviction evidentiary hearing (as contemplated by La. Code Crim. Proc. art. 929(A) which expressly allows for summary disposition by a state district court), that fact alone does not entitle him to a federal evidentiary hearing to secure new evidence at this stage of review, as the United States Supreme Court has plainly held. *Pinholster, supra.*

[35]   Rec. Doc. 3, Petition, pp. 29-30.

dated August 5, 2011.[36]    In her statement, she claims that Camper acted in self-defense because since 2002 or 2003 when they became neighbors the relationship between the victim and Camper had been strained and tumultuous.    She describes incidents that included the victim trashing their backyard space, damaging their truck and threatening Camper when he accessed a fuse box on the victim's side of the property, which led the Campers to report his actions to the landlord and the police.    According to Mrs. Camper, she knew the victim made threats in the past to others about harming them and that he owned a gun.    She also believes he wanted to pick a fight that night, that he had a gun on him, and that he had taken drugs that day, "because he seemed a little bit to [sic] cocky."

With respect to ineffective assistance and uncalled witnesses, the United States Fifth Circuit Court of Appeals has explained:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain. For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense. This requirement applies to both uncalled lay and expert witnesses.

*Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets omitted); *accord Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an

---

[36]  State Rec. Vol. 1 of 6.

ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."). Applying these principles, Camper's claim fails for several reasons.

First, the record refutes his allegation that defense counsel made no attempt to subpoena Mrs. Camper for trial.[37] The record is replete with evidence of counsel's efforts to issue and reissue subpoenas to Mrs. Camper at her residence in Montgomery, Alabama. In fact, Camper's testimony at trial confirmed these efforts, albeit unsuccessful, to locate Mrs. Camper. During direct examination, he testified that he could not get in touch with Mrs. Camper and agreed wholeheartedly that [counsel for the defense] had "done everything in [their] power to try to find her."[38] Therefore, Camper cannot establish deficient performance for failing to subpoena Mrs. Camper simply because attempts to subpoena her proved unsuccessful. Second, the record refutes any argument or assertion by Camper that his wife was available to testify at the time of trial. In order to prevail on an ineffective assistance claim for failure to call a witness, petitioner must establish that the witness was

---

[37] State Rec., Vol. 1 and 2 of 6, Subpoena for October 22, 2007 trial, Motion for Re-Issuance of an Out-of-State Subpoena filed September 26, 2007; Petition for Certification of Materiality of Out-of-State Witness filed September 14, 2007; Motion for Continuance filed September 26, 2007 (requesting October trial date in order to subpoena witness).

[38] State Rec., Vol. 5 of 6, Trial Transcript (Oct. 25, 2007), pp. 29-30.

available to testify and would have done so.    Mrs. Camper's statement submitted years

after trial does not overcome clear evidence of her unavailability or unwillingness to testify

at the time of trial.    Third, Mrs. Camper's unsworn statement fails to demonstrate that her

testimony would have been favorable to the self-defense theory upon which the case hinged.

Mrs. Camper's assertions related to the victim's alleged belligerent conduct and bad

character based upon his past interactions with the Campers.    Her testimony in this regard

was duplicative of Camper's testimony that he and his family had reason to fear the victim;

however, it fails to support a key element of self-defense—a reasonable belief that one is in

*imminent danger* of losing his life or receiving great bodily harm and that the killing is

necessary to save himself from that danger.    *See* La. Rev. Stat. § 14:20(A)(1).    Unlike the

assertions of Fletcher Johnson, an eyewitness to the shooting and the events immediately

preceding the shooting, Mrs. Camper's assertions concern mainly past conflicts with the

victim, which she claims supported her husband's reasonable fear of the victim that night in

particular.    However, her statement included no suggestion that she personally saw the

victim that night threaten to shoot her husband with a gun such that Camper's actions could

be viewed as self-defense.    Thus, her testimony was of little, if any, benefit to the self-

defense theory advanced at trial.    Accordingly, denial of this ineffective assistance claim

was proper.

    *4. Failure to object to trial judge's comment on evidence*

    Camper next argues that defense counsel rendered ineffective assistance when he

34

failed to object to an erroneous comment about the evidence made by the trial judge.[39] During defense counsel's cross-examination of Fletcher Johnson, the following exchange occurred:

Q. Did you ever hear [the victim] say Happy New Year to [the defendant] like in a friendly sort of way?

A. I don't know.

Q. You've got to answer yes or no.

A. I don't recall.

Q. What?

A. I don't recall.

Q. Well, you said that the second he got off the bike he was fighting, arguing with Mr. Camper immediately.    My simple question is: Did you ever hear, like his wife heard, him wishing everyone a Happy New Year?

*Prosecutor*: Objection, Your Honor, only in that he's asked five questions. The witness has said he doesn't know.

*Defense*: You've got to admit he's not giving – he's being very recalstry (phonetic) about his answers in those answers.

*By the Court*: *Actually he's already answered the question and he said he did hear it, Mr. Smith [defense counsel]. But I'll allow you to ask him again.*

*Defense*: Judge, it's very important we have particular testimony.

*By the Court*: I heard it and the jury has heard it. But I'll let you ask it again, Mr. Smith.

\*    \*    \*    \*

---

[39] Camper argued on direct appeal that the trial court mischaracterized the witness's testimony.    The appellate court called the remark "problematic," but found that the claim was not preserved for review because there was no contemporaneous objection.    *State v. Camper*, 996 So.2d at 579.

Q. And you didn't see [the victim] having any sort of conversation with other people when he got off of his bike?

A. They started arguing, his wife –

Q. No, no, before the argument.

A. I don't recall.

Q. What?

A. What other people?

Q. Yeah, like other neighbors, friends.

A. Somebody stopping and talking?

Q. Happy New Year, how are you doing? How's life?

A. I don't recall.

Q. Have a healthy, Happy New Year.

*Prosecutor*: Your Honor, he has said he doesn't recall now four times.

*Defense*: All right.[40]

The judge's remark in recalling the testimony, though incorrect, was brief and isolated.    There is no evidence that the trial judge ever intimated his opinion on the merits of the case.    Nor did the trial judge's comment reflect any bias on his part.    *See e.g., Todd v. Stegal*, 40 F. App'x 25, 27 (6th Cir. 2002).    Furthermore, the judge's remark did not likely confuse the jury under the circumstances.    The prosecutor correctly summarized the witness's testimony in her objection to repetitiveness, stating the witness has said multiple times "he doesn't know."    Immediately thereafter, defense counsel again elicited from Johnson twice more that he did not recall such a statement by the victim, for a total of five

---

[40]   State Rec., Vol. 4 of 6, pp. 71-73.

negative responses by Johnson.    The prosecutor then summarized for the Court that "the witness has said he doesn't recall now four times."    Rather than object to the trial court's mischaracterization and risk appearing argumentative with the trial judge or calling attention to the judge's comment, defense counsel simply posed the question again to the witness, who reiterated his earlier response that he did not recall.    Counsel's decision in this regard was not objectively unreasonable, but rather, a matter of trial tactics. "Informed strategic decisions by counsel are given a heavy measure of deference and should not be second guessed."    *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999); *see also Walker v. United States*, 433 F.2d 306, 307 (5th Cir. 1970) ("Since an objection may tend to emphasize a particular remark to an otherwise oblivious jury, the effect of objection may be more prejudicial than the original remarks...").    Furthermore, Camper has failed to establish a reasonable probability that, but for counsel's failure to object to the trial judge's comment, the result of the proceeding would have been different.    Camper is not entitled to relief on this claim.

For the foregoing reasons, Camper has failed to demonstrate that the state court's decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.    Thus, under the AEDPA's doubly deferential standard applicable to ineffective-assistance claims, the claims should be rejected.

**B.  Denial of right to appellate review/free copy of trial court record**

Camper asserts that he was denied the right to receive a free copy of the trial-court record, thereby preventing him from fully developing his post-conviction relief claims in violation of the right to appellate review.    He alleges the existence of "other crucial ineffective assistance of counsel errors," which based on his limited recollection include a failure to challenge the State's deficient proof of specific intent or to challenge the exclusion of African-American prospective jurors during voir dire, and possibly other instances as well.[41]

To the extent he may argue that the trial court erred in denying his request for free transcripts under Louisiana law, the claim plainly fails.    The state court's interpretation and application of its own laws is a matter of state concern only.    "[I]t is not the province of a federal habeas court to reexamine state-court determination on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."    *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

Additionally, there is no constitutional mandate that Camper must be afforded a free copy of his state-court criminal record for purposes of post-conviction proceedings.    *Smith v. Beto*, 472 F.2d 164 (5th Cir. 1973); *see also Cook v. Cain*, 2015 WL 6702290, at *2 (E.D. La. 2015) (citing *United States v. MacCollom*, 426 U.S. 317, 323–24 (1976); *Deem v. Devasto*, 140 F. App'x 574, 575 (5th Cir. 2005) and *Crawford v. Costello*, 27 F. App'x 57, 59 (2nd Cir. 2001)).

---

[41]   Rec. Doc. 3, pp. 36, 38.

The right to free transcripts is not absolute; it requires a showing of particularized need. *Smith v. Beto*, 472 F.2d at 165.   A post-appeal indigent defendant is not entitled to a free transcript "if he had access to the record on direct appeal and fails to demonstrate that he requires the record to establish a non-frivolous post-conviction claim."   *Id.* at 165; *see also Yates v. Collins*, 92-2335, 1993 WL 82111, at *1 (5th Cir. 1993).

The record in this case confirms that Camper's appointed direct-appeal counsel forwarded Camper a copy of the entire state-court record once his appeal concluded.   On direct appeal, an indigent criminal defendant has an absolute right to a trial transcript, or an alternative device that fulfills that same function.   *Griffin v. Illinois*, 351 U.S. 12 (1956). That transcript was, in fact, provided to Camper through his counsel of record, and was later sent to Camper for use on collateral review.[42]   Essentially, Camper is requesting a more complete record, including voir dire proceedings etc., so that he may search for "potential" constitutional errors, rather than support specific errors he has already clearly identified. The state courts denied the post-conviction claim without citing reasons, but plainly the record supports such a denial because Camper failed to show a particularized need under the circumstances.   Camper does not specify with any reasonable particularity the facts underlying his purely theoretical and unsupported claims so as to show his entitlement to

---

[42]   State Rec., Vol. 2 of 6, June 10, 2009 Correspondence to Camper from the Louisiana Appellate Project.

any additional free transcripts.[43]    Because Camper has not shown that the state court's

denial of this claim was either contrary to or an unreasonable application of federal law, he

is not entitled to relief.


**C.  Cumulative error**

Finally, the Court addresses Camper's complaints regarding "cumulative error."    He

contends the cumulative effect of the errors raised herein denied him a fair trial.    The Fifth

Circuit succinctly summarized the cumulative error test:

> "The cumulative error doctrine ... provides that an aggregation of non-
> reversible errors (i.e., plain errors failing to necessitate reversal and harmless
> errors) can yield a denial of the constitutional right to a fair trial, which calls
> for reversal." The doctrine applies only "where (1) the individual errors
> involved matters of constitutional dimension rather than mere violations of
> state law; (2) the errors were not procedurally defaulted for habeas purposes;
> and (3) the errors 'so infected the entire trial that the resulting conviction
> violates due process.' "

*Allen v. Vannoy*, 14-70009, 2016 WL 4254375, at *20 (5th Cir. 2016).    As discussed herein,

Camper has established no errors, so there is nothing to cumulate.    *United States v. Valas*,

822 F.3d 228, 248 (5th Cir. 2016).    As the United States Fifth Circuit Court of Appeals has

noted with respect to analogous claims of cumulative error: "Twenty times zero equals zero."

---

[43]   Indeed the state-court record refutes even his basic factual allegations with
respect to voir dire proceedings (*i.e.*, the number of strikes used by the State).    At one point,
Camper states he believes that during voir dire examination, the State used more
peremptory challenges than are allowed under state law, La. C.Cr.P. art. 799 (Rec. Doc. 3, p.
38); however, a minute entry for that date reflects that eight jurors were excused by the
State.    State Rec., Vol. 3 of 6, Minute Entry, 10/23/07.

*Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987).   Accordingly, Camper is not entitled to relief on this claim.

## **RECOMMENDATION**

**IT IS RECOMMENDED** that Camper's application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[44]

New Orleans, Louisiana, this ___6th___ day of _____January_____, 2016.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[44] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.